**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

SCOTT CAMPBELL, *et al.*,

               Plaintiffs,

               v.

RAVIN CROSSBOWS, LLC, *et al.*,

               Defendants.

Civil Action No. 23-1862 (ZNQ) (JBD)

**OPINION**

**QURAISHI, District Judge**

    **THIS MATTER** comes before the Court upon two motions filed by Defendants Ravin Crossbows, LLC and Velocity Outdoor Inc. (collectively, "Defendants"): (1) a motion for summary judgment (the "Summary Judgment Motion," ECF No. 29); and (2) a motion to exclude, or in the alternative, to limit the testimony of expert Craig Clauser (the "*Daubert* Motion," ECF No. 30). Defendants submitted briefs in support of the motions. ("Defendants' SJ Br.," ECF No. 29-1; "Defendants' Daubert Br.," ECF No. 30-1.) Plaintiffs Scott and Melanie Campbell ("Plaintiffs") filed opposition briefs. ("Plaintiffs' SJ Opp. Br.," ECF No. 31-1; Plaintiffs' Daubert Opp. Br.," ECF No. 32-1.) Defendants submitted reply briefs. ("Defendants' SJ Reply Br.," ECF

1

No. 34; "Defendants' Daubert Reply Br.," ECF No. 33.)[1] The Court has carefully considered the parties' submissions and decides the Motions without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1.[2] For the reasons set forth below, the Court will **GRANT-IN-PARTY** and **DENY-IN-PART** the *Daubert* Motion and **GRANT-IN-PART** and **DENY-IN-PART** the Summary Judgment Motion.

I. **BACKGROUND AND PROCEDURAL HISTORY**[3]

   A. **FACTUAL BACKGROUND**

This case arises from personal injuries to Plaintiff Scott Campbell ("Scott")[4], an experienced hunter. (ECF No. 35, at 23.) On November 9, 2022, Scott was hunting from a ladder stand with a Ravin 10 Crossbow ("Ravin 10"). (*See generally* ECF Nos. 35 and 36.) The Ravin 10 Crossbow is manufactured by Ravin Crossbows, LLC ("Ravin Crossbows") and is "designed from the ground up to provide unparalleled down range accuracy." (ECF No. 36 at 5; ECF No. 29-4 at 4.)[5] Prior to November 9, Scott successfully fired the Ravin 10, at the time of purchase and afterwards. (ECF No. 36 at 6.) Scott understood the warnings and instructions contained in

---

[1] Defendants attached to their Summary Judgment Motion a Statement of Undisputed Facts ("SOF," ECF No. 29-2), Scott Campbell's deposition transcript ("T1," ECF No. 29-3), a Ravin Crossbow instruction manual (ECF No. 29-4), and a transcript of Craig Clauser's deposition ("T2," ECF No. 29-5). Plaintiffs attached to their opposition a responsive statement of material facts (ECF No. 31), a report from Plaintiff's expert Craig Clauser ("Clauser Report," ECF No. 31-3), Craig Clauser's CV (ECF No. 31-4), Dr. Bruce A. Monaghan's ("Dr. Monaghan"), the doctor that treated Scott Campbell's injuries, medical report (ECF No. 31-5), Dr. Monaghan's CV (ECF No. 31-6), Scott Campbell's deposition testimony ("T3," ECF No. 31-7), Melanie Campbell's deposition testimony ("T4," ECF No. 31-8), a picture of a ladder stand (ECF No. 31-9), Craig Clauser's deposition transcript ("T4," ECF No. 31-10), Douglas Guthrie's, Vice President of New Product Development for Archery at Ravin Crossbows, deposition transcript ("T5," ECF No. 31-11), and a picture of Scott Campbell's injuries (ECF No. 31-12). In support of Defendants' *Daubert* Motion, Defendants submitted a copy of Scott Campbell's deposition transcript ("T6," ECF No. 30-2), a Ravin Crossbow instruction manual (ECF No. 30-3), and Craig Clauser's deposition transcript ("T7," ECF No. 30-4).
[2] Hereinafter, all references to "Rule" or "Rules" refer to the Federal Rules of Civil Procedure unless otherwise noted.
[3] The factual background is derived from admitted and/or undisputed facts gleaned from the parties' articulations of the facts as shown in Defendants' Response to Plaintiffs' Response to the Undisputed Statement of Facts (ECF No. 35) and Defendants' Response to Plaintiffs' Supplemental Statement of Undisputed Material Facts (ECF No. 36).
[4] To avoid ambiguity and confusion between Plaintiffs, the Court refers to Scott Campbell as "Scott."
[5] Defendant Velocity Outdoor Inc. ("Velocity Outdoor") is the sole member of Ravin Crossbows.

the Ravin Crossbow manual and even used the crossbow to harvest a deer six times previously. (ECF No. 35, at 33–34.)

On the evening of November 9, 2022, Scott and his wife went hunting. (*Id.* at 35.) Scott was on land owned by the State of New Jersey and his wife was on privately owned land owned by a friend. (*Id.*) Scott climbed a ladder stand and sat on the stand[6] when a deer came into view. (*Id.* at 8; T1 65:15–17.) Scott attached the stand to the tree a "year and a half" to "two years" earlier, and it was used by other hunters as is typical in New Jersey on state game land. (T1 66:8–9; ECF No. 35 at 36.) When Scott attached the ladder stand to the tree, it contained a stabilizer bar, but on November 9, the stabilizer bar was not present. (T1 66:18–20.) Scott testified that after he climbed the stand and had the crossbow cocked, he hoped to see a deer:

> I was waiting and I can see in the distance there's something moving, not sure what it is. Wait, wait, sit steady. Deer comes out. I wait for it to try to come a little bit closer, but he's kind of veering off. So now I have to make a decision whether to shoot or if he's going to go away. He was going towards my wife so I wanted to shoot it. No. I'm just kidding. So I waited until he got broadside and lifted his front shoulder up like that. I lifted the bow up just like that, clicked the safety off, pulled the trigger, and next thing I know I was on the ground (indicating). That's what I recall.

(T1 96:20–25 to 97:1–8; ECF No. 36 at 8.) Instead of hitting the deer, the arrow fell to the ground a few feet in front of Scott. (ECF No. 36 at 11.) When Scott got up, he was bleeding profusely and went to his wife who took him to the emergency room. (*Id.* at 14; T1 101:15–19.)

According to Scott's testimony, the emergency room doctor said that he had whiplash. (T1 18:23-24.) The emergency room also observed lacerations on Scott's forehead and a left wrist injury. (T1 114:1-10.) Scott testified that later that night, his wife Melanie found the arrow on the

---

[6] In this Opinion, "stand," "ladder," and "ladder stand" will be used interchangeably. A stand is "primarily designed to provide a hunter with a method by which they can hunt from an elevated position above and closer to the game they are hunting." (ECF No. 35, at 19.) A ladder stand is a style of stand where a hunter can ascend the tree and access a hunting platform through the use of ladder. (*Id.* at 20.)

3

ground not far from where it was shot. (T1 98:4-18.) She also found binoculars that Scott was wearing while hunting. (*Id.*)

A few days after the incident, Scott sought medical treatment from Dr. Bruce A. Monaghan, M.D. (*See* "Monaghan Report," ECF No. 31-5.) Dr. Monaghan observed that Scott had a displaced intraarticular fracture of the distal radius with significant comminution of the dorsal and volar cortex. (*Id.*) He also had signs of post-traumatic acute carpal tunnel syndrome. (*Id.*) On November 16, 2022, Scott underwent open reduction internal fixation of the distal radius and had a carpel tunnel release. (*Id.*) Dr. Monaghan also directed hand therapy. (*Id.*) Scott also met with a dermatologist to discuss the scarring on his forehead from the lacerations. (T4 48:1–24.)

Craig Clauser, Plaintiffs' expert, testified that it was his expert opinion that the incident was a result of a derailment of a bowstring on the crossbow. (T2 11:13–14.) In other words, Clauser believed that the accident happened because the bowstring came out of the groove at the end of the cam. (T2 11:20–24.) In his report, Clauser explained that

> Mr. Campbell fell from the ladder stand he was located on when the crossbow he was using malfunctioned and as he described "exploded". Mr. Campbell was injured as the result of this incident. The cause of the crossbow "explosion" was that the bow string derailed from the right side cam which translated the nock end of the arrow to the left fracturing the arrow and allowing the left side cam to rapidly over rotate which damaged and broke the left side cam cables allowing the left limb to violently fully extend. The hazard of bow string derailment was well known to Ravin but the failed to take measures to address the hazard to reduce the hazard and were satisfied to attribute it to user error.

(Clauser Report at 3, 5.) In addition to Clauser, Guthrie testified at a deposition for Defendants in his capacity as Vice President of New Product Development for Archery at Ravin Crossbows. (T5 8:17–18.)

## B.  PROCEDURAL HISTORY

Plaintiffs filed their initial Complaint in Mercer County Superior Court on March 1, 2023. (ECF No. 1.) Defendants timely removed the matter to this Court on April 3, 2023. (*Id.*) Defendants then filed an Answer to the Complaint. (ECF No. 5.) After discovery, Defendants filed the present motions. (ECF Nos. 29, 30.)

## II.  SUBJECT MATTER JURISDICTION

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the parties are diverse, and the value of the controversy exceeds $75,000.

## III.  LEGAL STANDARD

### A.  *DAUBERT*

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Federal Rule of Evidence "702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (internal citations omitted). For expert evidence to be admissible under Federal Rule of Evidence 702: "(1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge [i.e., reliability]; and (3) the expert's testimony must assist the trier of fact [i.e., fit]." *United States v. Schiff*, 602 F.3d 152, 172 (3d Cir. 2010) (quoting *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008)). In applying Rule 702, "a trial judge acts as a 'gatekeeper' to ensure that 'any and all expert testimony or evidence is not only relevant, but also reliable.'" *Pineda*, 520 F.3d at 243.

"[A]n expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 742 (3d Cir. 1994) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)).

5

However, "an expert's bare conclusions, unsupported by factual evidence are an inadmissible net opinion." *Faragalla v. Otundo*, 626 F. Supp. 3d 783, 786 (D.N.J. 2022) (citation and internal quotation marks omitted); *H.M. ex rel. B.M. v. Haddon Heights Bd. of Educ.*, 822 F. Supp. 2d 439, 448 (D.N.J. 2011) (An "expert's bare conclusions are not admissible under [the fit requirement] of Rule 702 of the Federal Rules of Evidence.") (alteration in original and citation omitted).

### B.     SUMMARY JUDGMENT

Rule 56 provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). The moving party bears the burden of establishing that no genuine dispute of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine dispute as to a material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine disputes of material fact exist).

In deciding a motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter but to determine whether there is a genuine dispute for trial.

*Anderson*, 477 U.S. at 248–49.  The summary judgment standard, however, does not operate in a vacuum.  "[T]he judge must view the evidence presented through the prism of the substantive evidentiary burden," *id.* at 254, and construe all facts and inferences in the light most favorable to the nonmoving party.  *See Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998).

## IV. DISCUSSION

### A. *DAUBERT* MOTION

Plaintiffs' theory of liability hinges upon Clauser's expert testimony.  Because the Court may only consider admissible evidence on summary judgment, the Court will address, at the outset, Defendants' *Daubert* Motion and determine whether Clauser's opinions are admissible.  For reasons to be shown, the Court will **GRANT-IN-PART** and **DENY-IN-PART** Defendants' *Daubert* Motion.

#### 1. Whether Clauser Is Qualified As An Expert

Qualification requires "that the witness possess specialized expertise."  *Schneider ex rel. Estate of Schneider*, 320 F.3d at 404.  Rule 702's qualification requirement is to be liberally construed.  *Pineda*, 520 F.3d at 244; *see also Paoli*, 35 F.3d at 741 (a "broad range of knowledge, skills, and training qualify an expert").  "[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate."  *Id.* (quoting *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996)).  A court should "eschew[] overly rigorous requirements of expertise and [be] satisfied with more generalized qualifications."  *Paoli*, 35 F.3d at 741 (citing *Hammond v. International Harvester Co.*, 691 F.2d 646, 652–53 (3d Cir. 1982) and *Knight v. Otis Elevator Co.*, 596 F.2d 84, 87–88 (3d Cir. 1979)).  For instance, "an otherwise qualified witness is not disqualified merely because of a lack of academic training."  *Waldorf v. Shuta*, 142 F.3d 601, 626 (3d Cir. 1998).  For an expert witness to

7

be qualified to testify as to causation, the witness must, "at a minimum," "possess skill or knowledge greater than the average layman in determining causation." *Aloe Coal Co. v. Clark Equipment Co.*, 816 F.2d 110, 114 (3d Cir. 1987).

Defendants argue that Clauser should be excluded because he lacks the practical experience within the hunting industry necessary to make a reliable opinion about liability and causation. (Defendants' Daubert Br. at 17.) The Court disagrees. The record shows that Clauser is an expert in engineering with over fifty years of engineering experience. (ECF No. 31-4.) As part of his work experience, Clauser was responsible for employee safety and training and failure analysis investigation which is relevant to the instant matter. Clauser is also a member of various professional societies and has contributed to the ASM Handbook on Failure Analysis and Prevention. (*Id.*) The Court therefore finds Defendants' argument unpersuasive because Clauser possesses skill or knowledge greater than the average layman in determining engineering issues. He need not have academic training in hunting to have an expert opinion on matters related to engineering. *See Waldorf*, 142 F.3d at 626. Defendants may prefer Clauser to be an expert in hunting and crossbows, but the law does not require that. *See Pineda*, 520 F.3d at 244; *see also Paoli*, 35 F.3d at 741. The Court therefore rejects Defendants' challenge to Clauser's qualifications.

### 2. Whether Clauser's Opinions Are Reliable

To be reliable, an expert opinion must be "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation[.]'" *Paoli*, 35 F.3d at 742 (quoting *Daubert*, 509 U.S. at 589). Further, "the expert must have 'good grounds' for his or her belief." *Id.* The focus of the reliability inquiry is on the expert's principles and methodology, not on his conclusions. *Daubert*, 509 U.S. at 595. In determining reliability, courts may look to several non-exhaustive factors, including:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Elcock v. Kmart Corp.*, 233 F.3d 734, 745–46 (3d Cir. 2000) (quoting *Paoli*, 35 F.3d at 742 n.8). These factors "may or may not be pertinent in assessing reliability" in every case, especially one involving engineers. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999).

The Supreme Court made clear in *Kumho Tire* that the general holding of *Daubert* that expert testimony be reliable and relevant applies to engineers and that the "law grants a district court . . . broad latitude when it decides how to determine reliability." *Kumho Tire*, 526 U.S. at 141–42. The Supreme Court emphasized that "[e]xperts of all kinds tie observations to conclusions through use of what Judge Learned Hand called 'general truths derived from . . . specialized knowledge." (*Id.* at 148 (quoting Hand, Historical and Practical Considerations Regarding Expert Testimony, 15 Harv. L. Rev. 40, 54 (1901)). Engineering testimony, however, rests upon scientific foundations, the reliability of which will be at issue in some cases. *Id.* at 150.

Here, Defendants, argue that Clauser's opinions lack sound methodology, are speculative, and fail to meet the reliability or relevance requirement of Federal Rule of Evidence 702. (Defendants' Daubert Br. at 23.) Specifically, Defendants suggest that Clauser has not provided any mathematical calculations, drawings, or diagrams to test the reliability of his reasonable alternative designs. (*Id.* at 27.) In rebuttal, Plaintiffs argue that

> Clauser's conclusions in this crossbow case are formed from the examination of the broken arrow shaft, and nature of its destruction through fracture, as well as the "witness marks" left on the shaft of the crossbow as the arrow traveled up the crossbow. From these,

9

> Clauser concludes that, upon pulling the trigger, the bow string had become derailed from the left cam, causing the rear of the arrow to shift right, breaking the arrow on the fame of the crossbow.

(Plaintiffs' Daubert Opp'n Br. at 11–12.)  Here, Clauser did not test a hypothesis or conduct peer review, but he did review the physical crossbow and came to a conclusion based on his expert opinion as an engineer.  (*See* ECF No. 31-3 ("The cause of the crossbow 'explosion' was that the bow string derailed from the right side cam which translated the nock end of the arrow to the left fracturing the arrow and allowing the left side cam to rapidly over rotate which damaged and broke the left side cam cables allowing the left limb to violently fully extend.")).  Clauser further determined based on his review of the crossbow that the "right side cam cables show no evidence of wear damage to the cable serving at the location where the left side cable failed.  This observation in conjunction with all of the cables being relatively new indicates that the failures were not the result of gradual weakening by wear over time, but rather the result of an overload event." *Id.*

The Court finds that Clauser's opinions on causation and liability in his report and deposition testimony are based on "good grounds" and his opinions are not mere speculation. *Paoli*, 35 F.3d at 742 (quoting *Daubert*, 509 U.S. at 589).  Clauser's opinions are based on his independent and close review of the crossbow at issue which is a generally accepted and reliable method.  *Daubert*, 509 U.S. at 595.  The Court is certain that Clauser, being an engineering expert, will "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire*, 526 U.S. at 152.  Thus, the Court finds that his opinions are centered on valid reasoning, reliable methodology, and sufficient standards.  Accordingly, the Court finds that Clauser's opinions are reliable.

Additionally, Defendants argue that Clauser's proposed alternative designs should be excluded from trial. (Defendants' Daubert Br. at 26–34.) In his report and deposition, Clauser testified to two reasonable alternative designs to the Ravin 10: (1) a cam with increased groove depth, or (2) "cam shields" or removable guards. (*See* Clauser Report; *see also* T2 148:14-20; T2 153:10-12.) As to the cam grooves, Defendants argue that Clauser's opinion is speculative and unreliable. (Defendants' Daubert Br. at 26–34.) For the reasons stated above, the Court disagrees. Clauser reviewed the physical crossbow involved in the incident at twenty times magnification, took photographs, and considered the marks on the arrow. (T2 112:9-10.) The fact that Clauser did not conduct his own testing does not disqualify his opinion or render it unreliable. *Silipena v. Am. Pulverizer Co.*, Civ. No. 16-711, 2024 WL 3219226, at *7 (D.N.J. June 28, 2024).

Although Clauser admittedly did not take measurements of the depth and width of the grooves of the cams, the Court finds that his engineering expertise allows him to testify about this design alternative. *See id.* (allowing an expert's hypothesis to be the product of "deductive reasoning, or cognitive consideration, as opposed to conducting his own experiments."); *Medina v. Daimler Trucks N. Am., LLC*, Civ. No. 10-623, 2014 WL 7405210, at *8 (D.N.J. Dec. 30, 2014). Although admittedly slim, it is clear to the Court that Clauser's proposed alternative design with respect to the cam grooves is based on sound reasoning and good faith grounds. The Court will therefore allow Clauser to testify on this issue. *Paoli*, 35 F.3d at 742; *Kemly v. Werner Co.*, 151 F. Supp. 3d 496, 503 (D.N.J. 2015) ("an expert may base his opinion on a particular version of disputed facts and the weight to be accorded to that 'opinion' rests with the jury.") (quoting *Krys v. Aaron*, 112 F. Supp. 3d 181, 195, 2015 WL 3660332, at *8, n.15 (D.N.J. June 12, 2015)).

Turning next to the cam shield alternative design, Defendants argue that Clauser's opinions related to the cam shield or removable guard are speculative and unreliable. (*Id.* at 34–35.) Here,

11

the Court agrees. In his report, Clauser opined without any support that "[p]lacing a physical guard around the cam to prevent unintended contact with foreign objects would be another approach that could have been investigated." (Clauser Report at 5.) In his deposition, Clauser testified that he never tested a crossbow with a removable guard or shield, never analyzed whether a crossbow with a shield would have other dangers, and never studied whether a crossbow with a shield would be effective at its intended purpose of shooting objects. This proposal would add an entirely new feature to Defendants' design.

Additionally, there is no evidence that a cam shield exists on any current or past crossbow on the market, and Clauser did not prepare or present an actual design with a cam shield. *See Simmons v. Ford Motor Co.*, 132 F. App'x 950, 953 (3d Cir. 2005) (affirming district court's exclusion of an expert who offered an "alternative [that] was nothing more than a sketch without a mock-up or testing of the design"). A cam shield might have helped reduce the risk of injury but there is nothing to show that it would be a reasonable alternative design to the Ravin 10. (T2 151:15 to 153:9.) Thus, it is apparent to the Court that Clauser's opinion that a cam shield or removable guard is a reasonable alternative design lacks the requisite reliability for it to be admissible under *Daubert*. Consequently, the Court will bar Clauser from testifying at trial about his proposed cam shield or removable guard. *See Ortiz v. Yale Materials Handling Corp.*, Civ. No. 03-3657, 2005 WL 2044923, at *6 (D.N.J. Aug. 24, 2005); *Sakolsky v. Genie Indus.*, Civ. No. 15-6893, 2021 WL 3661398, at *8 (D.N.J. Aug. 18, 2021).

        3.      <u>Whether Clauser's Opinions Will Assist the Trier of Fact</u>

Defendants argue in a footnote in their moving brief that Clauser's proffered testimony must be excluded because he performed no testing or analysis to determine the root cause of the incident and that he failed to draw, design, or otherwise create and test his alternative designs.

(Defendants' Daubert Br. at 34 n.1.)[7] As such, his testimony lacks the relevant information that will assist the jury. (*Id.*) Plaintiffs maintain that Clauser has the specialized knowledge, skill, experience, training, and education to help the finder of fact understand the evidence in the case. (Plaintiffs' Daubert Opp'n Br. at 14.)

This issue is relatively straightforward. Clauser's opinion pertains to the injuries Scott allegedly suffered as a result of the November 9, 2022 accident and will assist the jury in determining questions of causation, liability, the nature of the injuries, and the extent to which Scott was allegedly injured. *See Lorenzo-Noda v. Kazak*, Civ. No. 18-13414, 2025 WL 900404, at *3 (D.N.J. Mar. 24, 2025). There is a valid connection between Clauser's testimony and the pertinent inquiry on the claims and defenses at issue. *Daubert*, 509 U.S. at 591–92. The Court therefore agrees with Plaintiffs that Clauser will assist the trier of fact.

In sum, the Court will **GRANT-IN-PART** and **DENY-IN-PART** Defendants' *Daubert* Motion (ECF No. 30).

### B.  MOTION FOR SUMMARY JUDGMENT

As to Defendants' Summary Judgment Motion, the Court will first analyze whether Plaintiffs' negligence claim (Count One) and breach of warranty claim (Count Three) are subsumed by their strict liability claim. (Defendants' SJ Br. at 34). Afterwards, the Court will discuss whether summary judgment dismissal is proper as to Velocity Outdoor, whether summary judgment is proper on Plaintiffs' strict products liability claim (Count Two), and whether summary judgment is proper as to Plaintiffs' loss of consortium claim (Count Four).

---

[7] It is possible that Defendants argument is waived because it was presented solely in a footnote. *Joyce v. Jaguar Land Rover N. Am., LLC*, Civ. No. 23-04281, 2025 WL 675888, at *9 (D.N.J. Mar. 3, 2025). Nonetheless, the Court has considered and ultimately rejects this argument.

1. Whether Plaintiffs' Common Law Claims Are Subsumed by The New Jersey Product Liability Act ("NJPLA")

Defendants argue that Counts One and Three of the Complaint—negligence and breach of warranty, respectively—are subsumed by Plaintiffs' New Jersey Product Liability Act ("NJPLA") claim (Count Two).[8] (Defendants' SJ Br. at 34.) Plaintiffs do not respond to this argument.

The NJPLA provides that

> [a] manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it: a. deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or b. failed to contain adequate warnings or instructions, or c. was designed in a defective manner.

N.J. Stat. Ann. § 2A:58C-2. The NJPLA defines a "product liability action" as "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty." *Id.* § 2A:58C-1(b)(3). The NJPLA defines "harm" as including "(b) personal physical illness, injury or death"; "(c) pain and suffering, mental anguish or emotional harm"; and "(d) any loss of consortium or services or other loss deriving from any type of harm described in subparagraphs (a) through (c)." *Id.* § 2A:58C-1(b)(2).

"In implementing the NJPLA, the Legislature intended 'to limit the expansion of products-liability law' and 'to limit the liability of manufacturers so as to balance[] the interests of the public and the individual with a view towards economic reality.'" *Hindermyer v. B. Braun Med. Inc.*, 419 F. Supp. 3d 809, 817 (D.N.J. 2019) (alteration in original) (quoting *Zaza v. Marquess & Nell*,

---

[8] The parties appear to assume that New Jersey law applies to this claim. Thus, the Court applies New Jersey law for the purposes of the Summary Judgment Motion.

14

*Inc.*, 675 A.2d 620, 627 (N.J. 1996)). "The New Jersey Supreme Court has explained that '[t]he language chosen by the Legislature in enacting the [NJPLA] is both expansive and inclusive, encompassing virtually all possible causes of action relating to harms caused by consumer and other products.'" *Id.* (first alteration in original) (quoting *In re Lead Paint Litig.*, 924 A.2d 484, 503 (N.J. 2007)). The NJPLA's language represents "a clear legislative intent that . . . the [NJPLA] is paramount when the underlying claim is one for harm caused by a product." *Sinclair v. Merck & Co.*, 948 A.2d 587, 596 (N.J. 2008). "As explained by the Third Circuit, the NJPLA 'effectively creates an exclusive statutory cause of action for claims falling within its purview.'" *Greisberg v. Bos. Sci. Corp.*, Civ. No. 19-12646, 2020 WL 278648, at *4 (D.N.J. Jan. 17, 2020) (quoting *Repola v. Morbark Indus., Inc.*, 934 F.2d 483, 492 (3d Cir. 1991)).

Recognizing the NJPLA's broad scope, "New Jersey federal and state courts have consistently dismissed product liability-related claims based on common law theories when at the heart of those theories is the potential harm caused by a product." *Hindermyer*, 419 F. Supp. 3d at 818 (citing cases). "In addition, courts have found that the NJPLA subsumes common law . . . claims so long as the harm alleged was caused by a product." *Id.* at 819 (citing cases). However, "[a]lthough the NJPLA generally subsumes common law negligence claims alleging that a plaintiff suffered harm as a result of a defective product itself, the NJPLA does not subsume negligence claims where the alleged harm stems from the independent conduct of a defendant." *Guardavacarro v. Home Depot*, Civ. No. 16-8796, 2017 WL 3393812, at *7 (D.N.J. Aug. 8, 2017); *Universal Underwriters Ins. Grp. v. Pub. Serv. Elec. & Gas Co.*, 103 F. Supp. 2d 744, 748 (D.N.J. 2000) (finding that the plaintiff's negligence claim did not fall under the NJPLA, where "the claim asserted by the [p]laintiff is not related to a defect in the product (i.e. the electricity), but rather to the maintenance and oversight of PSE&G's emergency response service").

"To determine whether the NJPLA subsumes a particular claim, the court must ascertain the type of harm that a plaintiff is alleging; namely, whether the harm involves property damage or bodily injury caused by the culprit product, or whether the harm was solely to the defective product itself." *Zimmerman v. Home Depot, Inc.*, Civ. No. 24-4353, 2024 WL 5126832, at *5 (D.N.J. Dec. 16, 2024). Put another way, "courts do not simply determine whether or not the victim's injury was literally 'caused by a product,'" but rather, "courts tend to look at the essence of the claims and decide whether or not the plaintiff is disguising what would traditionally be considered a products liability claim as an alternative cause of action." *New Hope Pipe Liners, LLC v. Composites One, LCC*, Civ. No. 09-3222, 2009 WL 4282644, at *2 (D.N.J. Nov. 30, 2009).

Here, looking to the essence of Plaintiffs' claims, the Court finds that their negligence claim (Count One) and breach of warranty claim (Count Three) are subsumed by the NJPLA because they pertain to harms caused by a product (i.e., the Ravin 10). The harm alleged is a series of bodily injuries caused by the allegedly defective crossbow. The Complaint alleges that "Defendants' conduct in making, selling, marketing, distributing, labelling, and packaging a defective Ravin R10 Crossbow was negligent and was the cause of the [P]laintiff's injuries." (Compl. ¶ 13.) This negligence claim is related to the alleged defective crossbow and not the independent conduct of a named defendant. Accordingly, the Court finds that Count One is subsumed into Count Two. *See Universal Underwriters Ins. Grp.*, 103 F. Supp. 2d at 746 ("New Jersey courts interpreting the [NJPLA] have consistently held that, as a general rule, common law actions for negligence and breach of implied warranty are subsumed by the NJPLA when the claims asserted fall within the act's purview.").

The same is true for Plaintiffs' breach of warranty claim (Count Three). The Complaint states that Defendants' conduct in supplying the defective product breached their warranties,

16

express and implied, and was the cause of the [P]laintiff's injuries." (Compl. ¶ 19.) The essence of the breach of warranty claim is therefore a product liability claim, and the allegations show that Plaintiff's breach of warranty claim is largely related to its defective product claim. Simply put, the harms alleged in this case arise from a purported defective product. Accordingly, Count Three is subsumed into Count Two.

For these reasons, the Court will **GRANT** this portion of Defendants' Motion for Summary Judgment, and will **DISMISS WITH PREJUDICE** Plaintiffs' claims for negligence (Count One) and breach of warranty (Count Three).

2. <u>Whether Summary Judgment Is Proper as To Defendant Velocity Outdoor</u>

Defendants also argue that Velocity Outdoor is entitled to summary judgment because there is no evidence that it sold, designed, manufactured, or otherwise distributed the crossbow. (Defendants' SJ Br. at 36–38.) Plaintiffs do not respond to this argument. Here, Velocity Outdoor is the sole member of Ravin and is neither the manufacturer nor the product seller of the crossbow at issue. Plaintiffs have presented no evidence to the contrary. Thus, as a matter of law, Velocity Outdoor cannot be liable. *See McKinley v. Skyline Corp.*, 900 F. Supp. 2d 408, 415 (D.N.J. 2012); N.J. Stat. Ann. § 2A:58C-8. Accordingly, the Court will **GRANT** this portion of Defendants' Motion for Summary Judgment.

3. <u>Whether Summary Judgment Is Proper as To Plaintiffs' Products Liability Claim</u>

For reasons to be shown, the Court finds that there are multiple disputed material facts for resolution by a jury. First and most notably, the parties dispute whether the Ravin 10 was defective. Second, the parties dispute whether Scott's injuries arose from the fall from the ladder stand, or from the defective crossbow itself. (*See* ECF No. 35 at 18.)

In the Motion, Defendants argue that summary judgment is proper because Plaintiffs cannot establish that a defect existed in the product. (Defendants' SJ Brief at 3.) Defendants contend that Clauser admitted in his deposition that there was no defect in the crossbow because a derailment event can occur in any crossbow. (*Id.* at 5.)[9]

Plaintiffs argue that they have established a *prima facie* NJPLA case against Defendants because Clauser's expert report and deposition show that there were two alternative routes for the crossbow to be safe. (Plaintiffs' SJ Opp'n Br. at 7.) Plaintiffs argue that Scott was injured by the defective crossbow and because it was not reasonably fit, suitable or safe for its intended purpose. (*Id.* at 8.)

"To plead a *prima facie* cause of action under any type of NJPLA claim, Plaintiff must adequately allege, *inter alia*, 'that the product was defective.'" *Eisenbrey v. Wal-Mart Stores E., LP*, Civ. No. 24-6299, 2024 WL 4712833, at *3 (D.N.J. Nov. 7, 2024) (quoting *Durkin v. Paccar, Inc.*, Civ. No. 10-2013, 2010 WL 4117110, at *6 (D.N.J. Oct. 19, 2010)). "There are three types of claims under the NJPLA: (1) design defect; (2) manufacturing defect; and (3) warnings defect." *Id.* (citing *Stick v. Smith & Nephew, Inc.*, Civ. No. 20-13811, 2021 WL 1997411, at *3 (D.N.J. May 19, 2021)). "The 'only difference' among the types of claims is 'the nature of the alleged defect.'" *Id.* (citing *Stick*, 2021 WL 1997411, at *3). "Under any theory, however, '[t]he mere occurrence of an accident and the mere fact that someone was injured are not sufficient to demonstrate the existence of a defect.'" *Id.* (alteration in original) (quoting *Vicente v. Johnson &*

---

[9] Defendants' summary judgment brief raises other arguments regarding the suitability of Clauser's testimony that have already been addressed by the Court in the context of the *Daubert* Motion set forth above. (*See* Defendants' SJ Br. at 5, 7.)

18

*Johnson*, Civ. No. 20-1584, 2020 WL 7586907, at *11 (D.N.J. Dec. 21, 2020)). The Court best understands Plaintiffs' strict products liability claim to be one alleging a design defect.[10]

To succeed under a strict liability design defect theory in New Jersey, "a plaintiff must prove that (1) the product was defective; (2) the defect existed when the product left the hands of the defendant; and (3) the defect caused the injury to a reasonably foreseeable user." *Jurado v. W. Gear Works*, 619 A.2d 1312, 1317 (N.J. 1993). Moreover, to show a design defect, a plaintiff must show "either that the product's risk [of harm] outweighs its [utility], or that an alternate design exists." *Stich v. Smith & Nephew, Inc.*, Civ. No. 20-13811, 2021 WL 1997411, at *4 (D.N.J. May 19, 2021). Defendants argue that summary judgment is proper because Plaintiffs cannot establish that a reasonable and safer alternative design exists. (Defendants' SJ Br. at 8–15.)

As to elements (1) and (2), Plaintiffs have presented sufficient evidence to demonstrate a genuine dispute of fact that Scott used the Ravin 10 in a foreseeable manner and that it was not reasonably fit, suitable, or safe for its intended purpose. In other words, Plaintiffs have presented a factual dispute about whether the crossbow was defective when it was used in its intended manner. The parties vigorously dispute which expert is more credible. Resolution of that question is also for a jury. Based on the evidence in the record, the Court simply cannot conclude as a matter of law that there was no defect in the Ravin 10 crossbow or that Clauser is less reliable than Defendants' expert.

As to element (3), causation, Defendants argue that the Ravin 10 did not cause Scott's injuries. For example, they argue that Scott was not wearing his safety harness which caused his injuries when he fell. (Defendants' SJ Br. at 27.) Plaintiffs counter that but for the explosive

---

[10] Plaintiffs do not expressly state which type of claim they are bringing but a fair reading of the briefing and Complaint show that they are bringing a design defect claim under the NJPLA. The Court therefore does not address whether Plaintiffs have shown a manufacturing defect or failure to warn claim.

19

failure of the crossbow, Plaintiff would not have fallen from the tree. (Plaintiffs' SJ Opp'n Br. at 11.) Thus, the parties' competing narratives as to the causation of—and the parties' potential relative responsibilities for—Scott's injuries also present a genuine issue of disputed fact that must be resolved by the jury as a trier of fact rather than the Court on summary judgment.

### 4. Whether Summary Judgment is Proper As To Plaintiff Melanie Campbell's Loss of Consortium Claim

As a final point, Defendants argue that dismissal is warranted as to Melanie Campbell's loss of consortium claim (Count Four) because a loss of consortium claim is a derivative claim that can only be asserted if the underlying personal injury claim also survives. (Defendants' SJ Br. at 36.) Having denied summary judgment on Scott's underlying NJPLA tort claim (Count Two), the Court will deny summary judgment on the loss of consortium claim as well.

## V. CONCLUSION

For the reasons stated above, the Court will **GRANT-IN-PART** and **DENY-IN-PART** the *Daubert* Motion (ECF No. 30), and will **GRANT-IN-PART** and **DENY-IN-PART** the Summary Judgment Motion (ECF No. 29). An appropriate Order will follow.

Date: April 29, 2025

                                                                           s/ Zahid N. Quraishi  
                                                                           **ZAHID N. QURAISHI**  
                                                                           **UNITED STATES DISTRICT JUDGE**